## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

**LEONA PAYNE,**                    )
                                    )
**DARRELL PAYNE,**                  )
                                    )
      **Plaintiffs,**      )
                                    )
**v.**                              )    **Case No. CIV-15-1061**
                                    )
**WS SERVICES, LLC,**               )
                                    )
      **Defendant.**       )

## <u>ORDER</u>

Three motions are before the Court. The Court resolves them by entry of a single order. The Court DENIES Defendant's Motion to Dismiss Plaintiffs' Second Claim for Retaliation as moot. (Doc. No. 47). The Court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment. (Doc. No. 54). Finally, the Court GRANTS Plaintiffs' Motion for Summary Judgment. (Doc. No. 55).

## I. BACKGROUND

### A. Factual History

This case stems from the refusal of Defendant WS Services, LLC, (WSS) to hire Plaintiff Leona Payne, the wife of a then-employee of WSS. Ms. Payne argues WSS failed to hire her because she was a woman and then terminated her husband, Darrell Payne, after he complained to WSS. The following facts are either undisputed or viewed in the light most favorable to the nonmoving party.

In January 2015, Plaintiff Darrell Payne was employed as a foreman for WSS Services. (Doc. No. 44). On January 28 of that month, Mr. Payne learned from WSS's general manager, Tom Spencer, that WSS was interested in hiring ten more laborers. (Doc. No. 62, Ex. 1, at 116–117). Mr. Payne asked Spencer, who was responsible for the company's hiring and firing decisions, if WSS would be interested in hiring Mr. Payne's wife, Leona Payne. (*Id.*, Ex. 12, at 7–10). Mr. Payne alleges that, in response, Spencer said that he "could see telling [co-owner of WSS] Carolyn that they had hired a woman," and that he "could see telling Carolyn that I hired Darrell Payne's wife. I'm not going to fly that." (*Id.*, Ex. 1, at 187–188, 249). Mr. Payne argues that he protested, explaining that his wife was qualified and could do the job. (*Id.*).

Regardless, Ms. Payne obtained an application for employment at WSS on January 28, 2015, and submitted it the next day. Ms. Payne called WSS over the next couple of days but did not reach anyone from WSS until February 3 or 4. (Doc. No. 62, Ex. 8, at 151, 336). Also on February 3, Mr. Payne had another conversation with Tom Spencer. (Doc. No. 62, Ex. 1, at 112–113). In this conversation, Spencer allegedly told Mr. Payne that he only hires young men to serve as blasters and painters (presumably the labor position that Ms. Payne had applied for) and accused Mr. Payne of having his wife apply in order to institute a lawsuit. (*Id.* at 112–113, 188–190). Mr. Payne says he again protested and explained to Spencer that the Paynes were merely looking for a second income. (*Id.*). Two days later, on February 5, Mr. Payne was terminated by WSS. (Doc. No. 44).

This termination followed alleged poor performance by Mr. Payne on a job site. At the time of his termination, Mr. Payne had been assigned by WSS to work in Cushing, OK,

on a project for another company, Enbridge. (Doc. No. 54, Ex. 11, at 72–73). On February 3, Mr. Payne had been moved to the night crew on that site, which WSS argues was the result of arguments that Mr. Payne had with his supervisor. (Doc. No. 54, Ex. 7, at 83). Further, WSS argues that an examination of the job site on the night of February 3 revealed that Mr. Payne was neglecting to monitor his crew. (Doc. No. 54, Ex. 11, at 23, 25–26, 31). The next night, an inspection by Spencer and Danny Brown, the Enbridge project manager, allegedly showed that Mr. Payne was once again not observing his crew and was instead in his truck. (Doc. No. 54, Ex. 30, at 26–29). WSS contends this was the final event that culminated in the decision to terminate Mr. Payne. It argues that while Mr. Payne had been a good employee during the first two years of his employment, during the final two years, Mr. Payne was combative with inspectors on job locations, his production declined, and he did not manage his crew as expected. (Doc. No. 54, Ex. 11, at 21). The Paynes dispute this, however, and contend that Ms. Payne's decision to apply for employment led to Mr. Payne's termination.

Ms. Payne contacted the EEOC on February 6, 2015, about filing a charge of discrimination in regard to Mr. Payne's firing and WSS's failure to hire her. (Doc. No. 54, Ex. 23). WSS contends, though, that Ms. Payne's gender had nothing to do with its decision not to hire her. Rather, it offers other reasons. For one, it claims it was not hiring laborers at the time. What's more, it cites earlier posts by Ms. Payne on her public Facebook page, posts in which Ms. Payne allegedly disparaged WSS's work environment, its employees, and the type of assignments Mr. Payne was receiving. (Doc. No. 54, Ex. 4–6). Spencer says his daughter had shown him these posts over the previous months, and after viewing them,

he decided he did not want to hire somebody who was hostile to the company instead of someone who was not. (Doc. No. 54, Ex. 11, at 10, 121–124, 172).

Ms. Payne did in fact post several comments about WSS on her Facebook page in the months before and after her husband's termination. For example, she posted a comment the morning of January 29, 2015—the day she applied—accusing WSS of not hiring women. (Doc. No. 54, Ex. 12). Her posts on February 3 continued to lament, albeit with profanities, the type of work her husband was receiving. (Doc. No. 54, Ex. 18). The next day, Ms. Payne began threatening legal action, and threatened, in two separate posts on February 4 and 5, to release recordings of WSS employees at work that Mr. Payne had allegedly taken in secret. (Doc. No. 54, Ex. 21–22). And on May 29, 2015, Ms. Payne took to the public streets of Cushing, Oklahoma, wearing a homemade sandwich board containing the following message:

> Husband fired after wife apply's [sic] for labor position.
> 1. Jan 29th 2015 wife applies
> 2. was told day of application Tom Spencer doesn't do hiring - Juan
> 3. got call back ~~Ja~~ Feb 3rd Juan looking at app.
> 4. Husband confronted by Tom Spencer on wife not being hired
> 5. Feb 4th at end of shift Tom Spencer's cousin wrote derogatory stuff inside the tank in sand
> 6. Feb 5th No call to me so called WS back. Husband called in & fired.

(Doc. No. 55, Ex. 29). Though the exact dates of every day she wore the sign are not known, Ms. Payne continuously posted about wearing the sign during May and June of 2015. (Doc. No. 54, Ex. 26–27, 29, 30). WSS insists that, as a result of Ms. Payne's Facebook posts and her sandwich board, it had to repair its relationship and restore confidence with

4

Enbridge, the company to whom Darrell Payne had been assigned by WSS for a project. (Doc. No. 61, at 5).

## B. Procedural History

The Paynes timely filed a charge of discrimination with the EEOC on March 17, 2015, and received their right to sue letters on July 16, 2015. They assert claims in violation of Title VII of the Civil Rights Act of 1964 and Oklahoma's Anti-Discrimination Act.[1] (Doc. No. 1). WSS then counterclaimed for defamation against Leona Payne (Doc. No. 9). After WSS filed an amended counterclaim (Doc. No. 30) that more specifically identified the three alleged defamatory statements of Ms. Payne, the Court dismissed one of those statements with prejudice. (Doc. No. 45). Ms. Payne now has brought her own retaliation claim against WSS, arguing that the company retaliated against her by bringing its defamation suit. (Doc. No. 44).

Thus, as it stands today, three motions are before the Court. WSS has moved to dismiss Ms. Payne's retaliation claim (Doc. No. 47). It has also moved for summary judgment on all claims asserted by the Paynes, including Ms. Payne's retaliation claim. (Doc. No. 54). In addition, the Paynes have moved for summary judgment on WSS's defamation claim (Doc. No. 55). Responses and replies have been filed as to each of these.

For the following reasons, the Court GRANTS in part and DENIES in part WSS's Motion for Summary Judgment. (Doc. No. 54). Additionally, the Court GRANTS the

---

[1] Importantly, Plaintiffs' state law discrimination claims are decided in the same manner as its federal claims. "Under the Oklahoma Anti-Discrimination Act, a defendant may assert any defense available to it under Title VII." *Bennett v. Windstream Commc'ns, Inc.*, 30 F. Supp. 3d 1243, 1259 (N.D. Okla. 2014), *aff'd*, 792 F.3d 1261 (10th Cir. 2015). Further, "a plaintiff's OADA claim fails if her federal discrimination claims fail." *See Barzellone v. City of Tulsa*, 2000 WL 339213, at *5 (10th Cir. Mar. 31, 2000).

Paynes' Motion for Summary Judgment on WSS's Defamation Claim. (Doc. No. 55). And because the Court grants summary judgment on Ms. Payne's retaliation claim, it DENIES WSS's Motion to Dismiss that claim as moot. (Doc. No. 47).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it affects the disposition of a substantive claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 247, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the initial burden of demonstrating the basis for its motion and of identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted). "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (alteration and internal quotation marks omitted). The Court then inquires "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. While the Court construes all facts and reasonable inferences in the light most favorable to the non-moving party, *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be

insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III. DISCUSSION – THE DISCRIMINATION CLAIMS

### A. Legal Background

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire . . . any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2. Further, Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). These two statutes thus prevent an employer from discriminating on the basis of sex or retaliating against an employee because the employee has opposed that employer's discrimination. The Paynes assert claims under both of these statutes, and WSS has moved for summary judgment as to all of the Paynes' discrimination claims.

There are two ways claimants may avoid summary judgment. The first is through the burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir.), *cert. denied*, 136 S. Ct. 690, 193 L. Ed. 2d 520 (2015). Under this framework, a plaintiff may use circumstantial evidence to establish a prima facie case for discrimination. *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1114–1115 (10th Cir. 2007). If the employee successfully does so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* And once

the employer does this, the burden again shifts back to the employee to prove that its proffered reason is merely pretext for discrimination. *Id.* Only by establishing this pretext does a plaintiff survive summary judgment. *English v. Colorado Dep't of Corr.*, 248 F.3d 1002, 1008 (10th Cir. 2001).

The second way a claimant may avoid summary judgment is by providing direct evidence of discrimination. While the Tenth Circuit has noted that *McDonnell Douglas* burden shifting will usually apply, it has caveated that the "burden-shifting framework may be unnecessary and inappropriate" where there is direct evidence of discrimination. *Id.* "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Riggs,* 497 F.3d at 1117. With these two standards in mind, the Court turns to Ms. Payne's claim for gender discrimination.

## B. The Court Denies WSS's Motion for Summary Judgment on Ms. Payne's Gender Discrimination Claim.

### 1. The Direct Evidence Standard need not apply for Ms. Payne's Gender Discrimination claim to avoid summary judgment.

At the outset, the Court notes that Ms. Payne makes a persuasive case that her gender discrimination claim should be evaluated under the direct evidence standard rather than *McDonnell Douglas* burden shifting. She points to several statements allegedly made by Spencer, who was responsible for hiring and firing decisions at WSS. (Doc. No. 62, Ex. 14). Ms. Payne alleges that in response to Mr. Payne's request to hire her, Spencer said that he "could see telling [co-owner of WSS] Carolyn that they had hired a woman," and that he "could see telling Carolyn that I hired Darrell Payne's wife. I'm not going to fly that."

(Doc. No. 62, Ex. 1, at 187–188). In addition, Ms. Payne alleges that Spencer told Mr. Payne that the company only "hire[s] young men to train as blasters/painters." (*Id.*, Ex. 1, at 113). She contends that these statements are direct evidence of discrimination, particularly because they were made in the context of discussing her potential employment at WSS.

Ms. Payne is correct that context matters: "if the content and context of a statement allow it to be plausibly interpreted in two different ways—one discriminatory and the other benign—the statement does not qualify as direct evidence." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013). Further, there must be some link between the allegedly discriminatory comment and the employer's later adverse action. For example, "stray remarks in the workplace" based on gender stereotypes do not constitute direct evidence of discrimination. *Heim v. State of Utah*, 8 F.3d 1541, 1547 (10th Cir. 1993). An employer's comments, however, "that women have inferior knowledge of tools and inferior ability to sell tools" made while interviewing job candidates will constitute direct evidence. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1217 (10th Cir. 2013). Spencer's comments, the Paynes argue, must be direct evidence: Spencer, a decision maker at WSS, was implying he would not hire a female.

In response, WSS insists this direct evidence standard is inappropriate, partly because they dispute that Spencer ever made the statements and partly because, even if he did, they can lend themselves to a benign rather than discriminatory interpretation. The Court could of course attempt to conjure up the ways that Spencer's statements could have possibly lacked discriminatory intent. But that is unnecessary: Ms. Payne has no trouble

presenting a prima facie case and surviving summary judgment under the *McDonnell Douglas* burden shifting framework.

   2. Ms. Payne's Gender Discrimination claim avoids summary judgment under the *McDonnell Douglas* burden shifting framework.

To establish a prima facie case for gender discrimination under the first step of *McDonnell Douglas* burden shifting, Ms. Payne must show "(i) that [she] belongs to . . . a minority; (ii) that [she] applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her] qualifications, [she] was rejected; and (iv) that, after [her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas Corp.*, 411 U.S. at 802.[2]

Because it appears that WSS does not contest that Ms. Payne is a member of a protected class by virtue of her gender and that she was qualified, the Court need not address those arguments. *See e.g., Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1195 (10th Cir. 2008). Thus, to survive summary judgment, Ms. Payne must only create a genuine issue of fact as to whether WSS was accepting applications when she applied and that after her rejection, the position remained open and WSS continued to seek applications.

---

[2] The Supreme Court has explained that the elements of a prima facie case can vary depending on the factual scenario, *Id*. at n.13. And the Tenth Circuit has noted that the elements hinge "on the context of the claim and the nature of the adverse employment action alleged." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1150 (10th Cir. 2008). Thus, several variations of the prima facie case have been used in the Tenth Circuit. *See, e.g., Tabor.*, 703 F.3d at 1216 (noting the variety). Because both parties have briefed Ms. Payne's gender discrimination claim under the older four-part *McDonnell Douglas* framework, the Court will analyze it under that test.

Ms. Payne has met this burden. She has offered evidence that on January 28, 2015, Spencer told Mr. Payne to encourage qualified applicants to apply because WSS "needed to hire about ten more laborers." (Doc. No. 62, Ex. 1, at 117). Further, Ms. Payne has presented evidence that WSS, in the three months after it rejected her application, hired more than ten men. (*Id.*, Ex. 15, at 5–9). This is enough to establish a prima facie case.

With Ms. Payne having established a prima facie case, the burden then shifts to WSS to proffer a legitimate, non-discriminatory reason for not hiring Leona Payne. In response, WSS argues that it did not want to hire somebody who had been hostile to WSS in the past. It points to the Facebook posts made by Ms. Payne made in the months before she applied. In these posts, she expressed her general dissatisfaction with WSS, particularly with how it was treating Mr. Payne at work, and threatened legal action. As Spencer, whose daughter would show him the Facebook posts, explained, he did not want to hire someone already hostile to WSS. (Doc. No. 54, Ex. 11, at 121, 124, 172).

Because WSS has put forth a legitimate, non-discriminatory reason for its refusal to hire Ms. Payne, the burden shifts back to her to establish pretext. *Riggs*, 497 F. 3d at 1114–1115. "[A] plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Zamora v. Elite Logistics, Inc.* 478 F.3d 1160, 1166 (10th Cir. 2007). "In establishing pretext an employee can show the employer's proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007) (quotation marks omitted). And

importantly, "all doubts concerning pretext must be resolved in plaintiff's favor" at the summary judgment stage. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997).

Alleging pretext, Ms. Payne returns once more to the alleged statements of Spencer about not wanting to hire women and the fact that WSS hired more laborers in the months after she applied. Because a rational trier of fact could find discriminatory intent, summary judgment against Leona Payne's gender discrimination claim is inappropriate.

## C. The Court Denies WSS's Motion for Summary Judgment on Mr. Payne's Retaliation Claim.

Mr. Payne's retaliation claim arises out of his termination. He argues that he was terminated because he opposed WSS's unlawful refusal to hire his wife. The Court finds that summary judgment is also inappropriate on his claim.

"To establish a prima facie case of retaliation, a plaintiff must demonstrate (1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action. *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

Thus, Mr. Payne must first show that he engaged in some form of protected activity under Title VII in opposing WSS's allegedly discriminatory hiring practices. This protected activity is best thought of as consisting of two types. First, there is of course the protection it provides for an employee's participating "in any manner in an investigation, proceeding, or hearing under" Title VII. *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1151 (10th Cir. 2008) (quoting 42 U.S.C.A. § 2000e–3(a)). This type of protection encourages

employees to "use the Title VII process to protect their rights." *Id.* Courts have termed this conduct "participation activity." *See e.g., Ray v. Ropes & Gray LLP*, 799 F.3d 99, 107 (1st Cir. 2015).

Yet Title VII also provides "opposition protection," or protection for an employee who opposes an employer's unlawful employment practice by means other than using the formal channels of Title VII. *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002). Further, this activity is protected "even if the [employee were] wrong about whether [the employer] had in fact engaged in violation of Title VII." *Id.* Protection simply requires an employee had a "good faith belief that Title VII had been violated." *Id.* This opposition taken outside of Title VII's established reporting mechanisms" can range from filing formal charges to voicing informal complaints to superiors." *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008). And though no magic words are required, the employee must at least convey to the employer his or her concern that the employer has engaged in an unlawful practice in order for the conduct to qualify as opposition activity. *Hinds v*, 523 F.3d at 1203.

The question here is thus whether Mr. Payne adequately conveyed his concern to Spencer, thereby rooting his conduct squarely within the confines of Title VII's protection. Further, this is a question for the Court: the "determination as to whether the [conduct] is protected activity is a question of law because it relies on an interpretation of Title VII." *Broderick v. Donaldson*, 338 F.2d 30, 41 (D.D.C. 2004). Mr. Payne points to the statements he allegedly made to Tom Spencer as evidence that he informally opposed WSS's refusal to hire his wife. First, Mr. Payne says that after Spencer said he would not hire Ms. Payne,

Mr. Payne told him that she had the ability and qualifications to do the job. (Doc. No. 62, Ex. 1, at 241). Second, he relies on the later conversation he had with Spencer where Spencer allegedly said that he only hired young men as blasters and painters and allegedly suggested that Mr. Payne had his wife apply because they were looking for a lawsuit. (Doc. No. 62, Ex. 1, at 112-113). Mr. Payne argues he explained to WSS that he was not looking for a lawsuit and that he only needed a second income.

The Court finds that these statements qualify as protected opposition under Title VII. Mr. Payne certainly did not explicitly tell Spencer that he was challenging the company's unlawful hiring practice. Yet such magic words are not required. *See Hinds*, 523 F.3d at 1203. Nor does the informality of these conversations knock them outside the realm of Title VII's protection, since there is no question that "informal complaints to superiors constitute protected activity." *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1213 (10th Cir. 2008). The relevant inquiry is whether Spencer would have been aware that Mr. Payne was opposing an unlawful hiring practice. After all, a retaliatory action "against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition." *Petersen*, 301 F.3d at 1188 (10th Cir. 2002).

Examining the context of the alleged conversations, the Court concludes Spencer was aware that Mr. Payne was challenging, however informally, WSS's decision not to hire Ms. Payne due to her gender. Consider why Spencer allegedly made his comments. His alleged explanation that WSS only hires men for the blaster/painter job was in direct response to Mr. Payne insisting that his wife was qualified for the job. And further, Spencer

would have had no reason to tell Mr. Payne that he believed the Paynes were looking to sue if he was not in fact aware the Paynes were accusing him of discriminatory hiring.

Because WSS concedes that termination qualifies as an action a reasonable employee would find materially adverse, Mr. Payne must prove that a causal connection existed between his opposition and his termination in order to satisfy the final element of his prima facie case. Simply put, he has done so. The conversations with Spencer—who made hiring and firing decisions—took place in the days leading up to Mr. Payne's termination. He was fired eight days after he allegedly first asked Spencer to consider hiring his wife, seven days after Ms. Payne applied, and two days after Spencer supposedly accused him of having his wife apply in order to institute a lawsuit.

With Mr. Payne having established a prima facie case for retaliation, "it [becomes] defendant's burden to prove by a preponderance that it *would* have made the same decision notwithstanding its retaliatory motive." *Medlock v. Ortho Biotech, Inc.,* 164 F.3d 545, 550 (10th Cir. 1999) (emphasis in original) (quotes omitted). WSS argues it fired Darrell Payne because he was confrontational and argumentative and neglected his duties. It also cites Mr. Payne's overall alleged poor performance, as evidenced by Enbridge management's alleged request that Mr. Payne be removed from a project.

Mr. Payne argues pretext, much of which overlaps with the causal connection he established in his prima facie case. In addition, he also points to the fact that another employee had been removed from a project but was not fired. All of this is enough to establish pretext. The Court thus denies WSS's Motion for Summary Judgment on Darrell Payne's retaliation claim.

**D. The Court Grants WSS's Motion for Summary Judgment on Leona Payne's Retaliation Claim.**

WSS has moved for summary judgment on Ms. Payne's retaliation claim. For clarity, Ms. Payne's retaliation claim arises from WSS's decision to sue her for defamation. Essentially, Ms. Payne argues that WSS only brought its defamation claim because she began alerting the public that WSS engages in discriminatory hiring and firing—conduct she contends is protected under Title VII. Because she fails to state a prima facie case for retaliation, the Court grants WSS's Motion for Summary Judgment on her claim.

Ms. Payne's claim fails because, unlike her husband, she has not shown she engaged in protected opposition activity under Title VII. As explained above, Title VII provides broad protection for an employee who opposes a "practice made an unlawful employment practice by [Title VII]." *Petersen*, 301 F.3d at 1188. The question is whether it encompasses the activity in which Ms. Payne engaged. The Court concludes as a matter of law that Ms. Payne's activity does not fall within the realm of protected activity under Title VII.

To begin, "[c]ertain broad premises can be accepted with confidence"—including that "an employee does not enjoy immunity from [an employer's adverse conduct] merely by claiming at all times she was defending the rights of her sex by 'opposing' discriminatory practices." *Hochstadt v Worcester Found. for Experimental Biology*, 545 F2d 222, 234 (1st Cir. 1976). "Although Congress plainly intended broad protection for individuals who complain of an employer's discriminatory conduct, it is equally clear that such protection is not without limits." *Gonzalez v. Bolger*, 486 F. Supp. 595, 601 (D.D.C.

1980).  As the Tenth Circuit has pointed out, "[t]he discrimination statutes do not confer a license to present grievances in an arrogant and uncivil manner." *Cuenca v. Univ. of Kansas*, 101 Fed.Appx. 782, 790 (10th Cir. 2004).

While case law is lacking on what constitutes protected activity by non-employees or applicants like Ms. Payne who seek to oppose discriminatory hiring, appellate courts have identified instances where an employee's behavior falls outside Title VII's field of protected activity. The leading case in the Tenth Circuit is *Robbins v. Jefferson County Sch. Dist. R–1,* 186 F.3d 1253 (10th Cir. 1999), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). There, the Tenth Circuit affirmed the district court's granting of summary judgment against an employee claiming retaliation. *Id.* at 1259–60. Like Ms. Payne here, the plaintiff in *Robbins* argued that her opposition was protected under Title VII. *Id.* The Tenth Circuit disagreed, recognizing that several circuits had previous held that "otherwise protected conduct may be so disruptive or inappropriate to fall outside the statute's protection." *Id.* at 1259.  As it explained, "the manner of pursuing a grievance, as opposed to the grievance itself, must be reasonable" in order to be protected, and determining that reasonableness is done by weighing 'the need to protect individuals asserting their rights [under Title VII] against an employer's legitimate demands for loyalty, cooperation, and a generally productive work environment.'" *Id.* (quoting *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d at 397, 401 (11th Cir. 1989)). In finding that the plaintiff's behavior was not protected, it noted that the Plaintiff "lodged frequent, voluminous, and sometimes specious complaints and engaged in antagonistic behavior toward her superiors." *Id.* The court took issue in

particular with plaintiff's accusing a supervisor of "slander, malicious intent, and untruthfulness," her calling her supervisor a puppet, and her complaining that another supervisor's responses to her grievances "contain[ed] false statements, and drip[ped] with hostility and bias." *Id.* "[A]s a matter of law," the Tenth Circuit held, "these activities were not reasonable and did not constitute protected opposition." *Id.* at 1260.

Other federal appellate courts have likewise declared that as a matter of law, certain conduct by plaintiffs falls outside the orbit of protected activity because, weighed against the employer's interest, it is unreasonable. The Eleventh Circuit, for example, held that an employee's spurious and repeated complaining outside of the chain of command and her reporting grievances in an antagonistic manner and outside of workplace procedure was not protected activity. *Rollins*, 868 F.2d at 401. And the Fifth Circuit has also weighed in, holding that an employee's effort to solicit others to join her in a discrimination suit against her employer was not protected activity. *Jones v. Flagship Int'l*, 793 F.2d 714, 728 (5th Cir. 1986); *also see Whatley v. Metropol. Atlanta Rapid Transit Auth.*, 632 F.2d 1325, 1329 (5th Cir. 1980) (affirming summary judgment against employee whose hostile and accusatory complaints of discriminatory practices and failure to follow established reporting procedures constituted a legitimate reason for discharge). And the Fourth Circuit has addressed the issue too: it found no protected activity where an employee sent documents from her employer's desk to a coworker so that the coworker could use them in a discrimination suit. *Laughlin v. Met. Wash. Airports. Auth.*, 149 F.3d 253, 260 (4th Cir. 1998). The Eighth Circuit, in fact, has gone even further, holding that informal complaints

to third parties do not constitute protected activity. *Bakhtiari v. Lutz*, 507 F.3d 1132, 1137 (8th Cir. 2007).

Contending that Ms. Payne's activity was protected, the Paynes cite only to *Laughlin*'s observation that opposition includes "staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities." 149 F.3d at 259. That much is true. But equally relevant, as gleaned from the cases above, is the specific manner in which Ms. Payne opposed WSS's alleged discrimination.

Though Ms. Payne posted several complaints to Facebook critical of WSS, it is not exactly clear which ones she argues constituted protected activity. Presumably she refers to the Facebook posts which reference gender discrimination and which she posted after she allegedly learned from her husband that Spencer had told him he would not hire Ms. Payne. After all, in order for her conduct to constitute protected activity, it would need to at least reference gender discrimination, since an "employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII." *Petersen*, 301 F.3d at 1188.

What is clear, however, is that Ms. Payne took to Facebook and public streets to air her grievances with WSS. There were of course those statements that the Court has already identified in its previous Order as being actionable in WSS's defamation claim: the Facebook posts on February 5, 2015, that "her company don't hire woman [sic]" and that "male womanizing people" run the company, and Ms. Payne's sandwich board, which said that a husband was fired after his wife applied for a labor position. (Doc. No 54, Ex. 21, 27). And while those allegations, when viewed in isolation, probably fall short of rendering

her conduct unreasonable, the manner in which she complained shoves her activity outside the protection of Title VII.

For one, Ms. Payne was not merely stating what she believed to be facts. Rather, she used her Facebook and sandwich board to hurl repeated accusations at WSS. There was her January 29 post—the day she applied for the job—that she "[m]ay have to run into female part of the company and see why woman don't work there" (Doc. No. 54, Ex. 12); her February 4 post that "the fact of the matter is that they don't hire women" (Doc. No. 54, Ex. 20); and her February 5 post that "you guys always keep saying they have hired woman [sic] in the past. Must have been a past life" and that it was "crap" that no one had contacted her in the few days since she submitted her application. (Doc. No. 54, Ex. 21). She also began a barrage of threats to bring legal action, predicting that "[i]t's only gone [sic] to get worse for them not us" and that WSS did not have the "balls" to admit to discrimination. *Id*. She alluded to recordings of people at WSS she had allegedly taken without their permission and threatened to play those over Facebook. *Id*.

But even putting Ms. Payne's qualms with WSS's hiring process aside, she still disparaged the company for reasons wholly unrelated to gender discrimination. The morning of the day she sent in her application she posted that "I would work for free and I could still work 99% better than some of the lazy ass people I've seen in the time you been there." (Doc. No. 54, Ex. 12). And on February 3, only days after applying, she lamented over the "two nights of shit work" her husband had allegedly been assigned. (Doc. No. 55, Ex. 17). She explains that while she wishes her husband was an "ass kisser," she is glad he

is not. *Id.* These are all comments Ms. Payne insists were meant to oppose WSS's alleged discrimination.

Finally, there was the decision to wear the sandwich board around the streets of Cushing, OK, in May and June 2015. While Ms. Payne again insists that she was protesting WSS's hiring practices, this alone does not necessarily sanction her conduct under Title VII, especially in light of "the purpose of [Title VII] [weighed] against Congress' equally manifest desire not to tie the hands of employers in the objective selection . . . of personnel." *Hochstadt*, 545 F.2d at 231. This is not to say that Ms. Payne did not have a strong interest in bringing WSS's allegedly discriminatory behavior to a halt. She certainly did, and WSS likewise has an ongoing interest in not having its brand and reputation publicly disparaged. But Ms. Payne, after all, had already contacted the EEOC on February 6 to initiate her charge of gender discrimination. In other words, the wheels of Title VII were already in motion, working towards the dual purposes of Title VII: "the elimination of unlawful discrimination in employment" and "mak[ing] those whole who have been injured by discrimination. *Smith v. Berks Cmty. Television*, 657 F. Supp. 794, 795 (E.D. Pa. 1987). Her wearing of the sandwich board certainly did not hasten that process. And any argument that she believed using Title VII's formal channels to remedy WSS's alleged discrimination would be inadequate is belied by private Facebook messages she sent to her son, at some unknown time after contacting the EEOC, telling him that the EEOC had already told the Paynes that they had a "great" case for discrimination and that "usually company offers to settle to get rid of us, wage, lost work, and forty thousand plus." (Doc. No. 54, Ex. 20). A later message sent on May 11, 2015—two weeks before Ms. Payne even

donned the sandwich board—explained that she had a hearing on June 5 and "that's when we settle with [WSS]." (Doc. No. 54, Ex. 25).

When viewed in context, Ms. Payne's "drastic actions are not akin to the measured responses to employer discrimination that [courts] have approved in the past." *Laughlin*, 149 F.3d at 260. Nor were her Facebook messages so different from the "barrage of inflammatory memoranda" by the plaintiff in *Robbins*. 186 F.3d at 1259. For these reasons, Ms. Payne's behavior fell outside the realm of opposition activity that Title VII sanctions. Because she has failed to state a prima facie case for retaliation, the Court grants WSS's Motion for Summary Judgment on Ms. Payne's retaliation claim.


## IV. DISCUSSION – THE DEFAMATION CLAIM

The Court finally turns to the defamation claim against Ms. Payne for comments she made on Facebook and the message she wore on her sandwich board. Ms. Payne has moved for summary judgment on that claim. Both parties' submissions on the summary judgment motion detail a litany of the allegedly defamatory statements made by Ms. Payne. (Doc. Nos. 55, 61, 63). But to be clear, only two defamatory statements are before the Court. While WSS originally asserted that three comments made by Leona Payne were defamatory (Doc. No. 30), the Court has already dismissed one of those comments with prejudice as being non-actionable opinion. (Doc. No. 45). That leaves two groups of comments for the court to address. The first is the comments on Ms. Payne's Facebook page on February 5, 2015, that "her company don't hire woman [sic]" and that "male

womanizing people" run the company. (Doc. No. 54, Ex. 21). The second is the message

on her sandwich board stating that her husband was "[f]ired after wife apply's [sic] for

labor position." (Doc. No. 54, Ex. 27).

## A.  Legal Background

Under Oklahoma law, "[a] communication is defamatory if it tends to so harm the

reputation of another as to lower him in the estimation of the community or to deter third

persons from associating or dealing with him." *Wilson v. City of Tulsa*, 91 P.3d 673, 680

(Okla. Civ. App. 2004).[3] For a private figure to state a claim for defamation, it must show:

"(1) A false and defamatory statement, (2) an unprivileged publication to a third party, (3)

fault amounting at least to negligence on the part of the publisher; and (4) either the

actionability of the statement irrespective of special damage [per se], or the existence of

special damage [per quod]." *Nelson v. Am. Hometown Publ'g, Inc.*, 333 P.3d 962, 969

(Okla. Civ. App. 2014).

## B.  The Court Grants Ms. Payne's Motion for Summary Judgment on WSS's Defamation Claim.

Because WSS has failed to create a genuine issue of fact as to the final element of

its defamation claim, summary judgment on that claim is appropriate. Assuming that WSS

has met its burden as to the first three elements of its claim, the Court turns to the fourth

element.  Under Oklahoma law, whether a claimant suing for defamation is required to

---

[3] Further, corporations may also bring defamation claims, since "corporations, like people, have reputations and may recover for harm inflicted on them." *Waste Mgmt. of Texas, Inc. v. Texas Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 149 (Tex. 2014).

plead special damages depends on whether the statement is defamatory per quod or defamatory per se. *Hargrove v. Okla. Press Pub. Co.*, 265 P. 635, 636 (Okla. 1928). Defamatory per quod statements are those that have "no overt opprobrious connotations" and require extrinsic facts or circumstances to find that a publication is defamatory. *Trice v. Burress*, 137 P.3d 1253, 1257 (Okla. Civ. App. 2006). In contrast, a statement is defamatory per se "only when the language used is susceptible of but one meaning, and that an opprobrious one." *Id*. In other words, if "extrinsic facts are required to show a defamatory meaning," then the statement is defamatory per quod and the claimant must plead special damages. *Nelson*, 333 P.3d at 974.

Considering that both of Ms. Payne's statements require extrinsic facts to take on a defamatory meaning, they are per quod defamatory. Take Ms. Payne's Facebook post, stating that "her company don't hire woman [sic]" and that "she has male womanizing people in charge of her company." (Doc. No. 54, Ex. 21). While it implies some company might be liable for gender discrimination, it certainly does not say who—an extrinsic fact which pushes it into the realm of defamatory per quod. WSS even admits that it is not named directly in the post. (Doc. No. 61, at 4). Nor is Ms. Payne's sandwich board more precise. It stated that

> Husband fired after wife apply's [sic] for labor position.
> 1. Jan 29th 2015 wife applies
> 2. was told day of application Tom Spencer doesn't do hiring - Juan
> 3. got call back ~~Ja~~ Feb 3rd Juan looking at app.
> 4. Husband confronted by Tom Spencer on wife not being hired
> 5. Feb 4th at end of shift Tom Spencer's cousin wrote derogatory stuff inside the tank in sand

> 6. Feb 5th No call to me so called WS back. Husband called in & fired.

(Doc. No. 55, Ex. 29). This too requires extrinsic facts in order to assume a defamatory meaning. There is no mention of gender discrimination, only that a wife applied and then, after a series of events, a husband was fired. To say that the board is open to but one interpretation would be to ignore the range of other possible explanations, such as that Ms. Payne was not qualified, or even that she was hostile to the company. Essentially, any interpretation of the sandwich board that WSS discriminated "had to come in the form of insinuation from the language." *Krebsbach v. Henley*, 725 P.2d 852, 856 (Okla. 1986). To be clear, though these statements are not defamatory per se, they likely qualify as defamatory per quod. But because they are merely defamatory per quod, WSS was required to plead special damages. Its allegation that it "had to repair its relationship and restore confidence" with a customer is insufficient. (Doc. No. 61, at 5). Summary judgment on WSS's defamation claim is therefore appropriate.

## CONCLUSION

The Court DENIES Defendant's Motion to Dismiss Plaintiff's retaliation claim as moot. (Doc. No. 47). Defendant's Motion for Summary Judgment (Doc. No. 54) is DENIED in part and GRANTED in part. Plaintiffs' Motion for Summary Judgment (Doc. No. 55) is GRANTED.

IT IS SO ORDERED this 25th day of October 2016.

*David L. Russell*

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE